

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4196 | **DATE** | 3/1/2004 |
| **CASE TITLE** | TIMOTHY CUNNINGHAM vs. VILLAGE OF MT PROSPECT | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, the motions of Defendants The Village of Mount Prospect, Michael Figolah, Charles Livingston, Henry Dawson, and Anthony Huemann [doc. no. 63-1] and Village of Mount Prospect Board of Fire and Police Commissioners [doc. no. 66-1] for summary judgment on the complaint of Plaintiff Timothy Cunningham are granted. Defendants' motion for sanctions under to Federal Rule of Civil Procedure 11 [doc. 82-1] is denied. This case is hereby terminated. ENTER MEMORANDUM OPINION AND ORDER.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | MAR 0 2 2004 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 83 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | CLERK | 3/1/2004 | | |
| CG | courtroom deputy's initials | on FEB 30 EN 4:47 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | CG | | |
| | | | mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TIMOTHY CUNNINGHAM,<br><br>Plaintiff,<br><br>v.<br><br>VILLAGE OF MOUNT PROSPECT, THE<br>BOARD OF FIRE AND POLICE<br>COMMISSIONERS OF THE VILLAGE OF<br>MOUNT PROSPECT, MICHAEL FIGOLAH,<br>CHARLES LIVINGSTON, HENRY<br>DAWSON, and ANTHONY HUEMANN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  No. 02 C 4196<br>)<br>)<br>)  Judge Ronald A. Guzmán<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DOCKETED**

MAR 0 2 2004

### MEMORANDUM OPINION AND ORDER

Before the Court are the motions of Defendants Village of Mount Prospect ("Village"),

Michael Figolah, Charles Livingston, Henry Dawson, and Anthony Huemann [doc. no. 63-1] and

Village of Mount Prospect Board of Fire and Police Commissioners [doc. no. 66-1] for summary

judgment on the complaint of Plaintiff Timothy Cunningham, which alleges Defendants retaliated

against Plaintiff for exercising his First Amendment rights, in violation of 42 U.S.C. § 1983. Also

before the Court is the motion of Defendants Village, Figolah, Livingston, Dawson, and Huemann

for sanctions under Federal Rule of Civil Procedure 11. For the reasons that follow, Defendants'

motions for summary judgment are granted, and Defendants' motion for sanctions is denied.



# FACTS

The following facts are undisputed and supported by competent evidence in the record except as otherwise noted, and all reasonable inferences have been drawn in favor of Plaintiff, the non-movant.

## A.    *Parties*

Plaintiff Timothy Cunningham has been employed by the Village of Mount Prospect ("Village") Fire Department as a firefighter and paramedic since 1987. (Pl.'s LR 56.1(b)(3)(B) ¶ 1.)

The individual defendants, Chief Figolah and Captains Livingston, Dawson, and Huemann are the current command staff of the fire department, which also includes Deputy Chief John Malcolm and Training Captain Gary Klein, who are not defendants. (Defs.' LR 56.1(a)(3) ¶ 8.) Chief Figolah reports to Michael Janonis, Mount Prospect's village manager and mayor. (Pl.'s LR 56.1(b)(3)(B) ¶ 54.) Chief Figolah became Fire Chief on March 1, 1998. (Defs.' LR 56.1(a)(3) ¶ 15.) The previous Fire Chief, Ed Cavello, served from 1986 to October 22, 1997. (*Id.* ¶ 14.) Former Chief Cavello is not a defendant.

Defendant Board of Fire and Police Commissioners ("Board") is established pursuant to state statute for the purpose of conducting new hire examinations, promotions, and discipline for the police and fire departments. (*Id.* ¶ 9.) The Board has no involvement in the internal operation of the fire department, including the administration of sick leave or negative sick time. (*Id.* ¶ 12.)

Under the structure of the fire department, firefighter/paramedics report to a Lieutenant, who reports to a Captain, who reports to the Deputy Chief, who reports to the Chief. (*Id.* ¶¶ 16-18.) Firefighter/paramedics are responsible for conducting fire inspections, extinguishing fires, performing rescue operations, operating firefighting apparatus, assisting in emergency medical

service functions, and providing paramedic services. (*Id.* ¶ 19.) Lieutenants, among other duties, assign and direct activities of firefighters at the scene, command activities until relieved by the Captain, evaluate and counsel firefighters in their performance. (*Id.* ¶ 20.)

**B.** ***Plaintiff's Employment Background***

Plaintiff served as an acting Lieutenant from June 1997 to February 2001, and he also was at times a paramedic evaluator, which required approval from the Chief, Deputy Chief, Administrative Captain, and the hospital. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 111-12, 114.) In his work as a firefighter/paramedic, Plaintiff received excellent performance reviews and was not written up or reprimanded. (*Id.* ¶¶ 115-16.) Plaintiff's evaluations were signed by seventeen different officers including Chief Figolah, Captain Dawson, Captain Livingston, and Captain Thill. (*Id.* ¶ 119.) Plaintiff received consistently positive comments regarding his competence, emergency scene performance, ability to interact with co-workers, leadership abilities, professionalism, and dedication to firefighter safety. (*Id.* ¶¶ 117-18, 120-28, 131.) On his 1994 evaluation, Captain Thill noted that Plaintiff would make a "fine lieutenant in the future." (*Id.* ¶ 126.) On his 1999 evaluation, Captain Livingston commented: "Cunningham is a good firefighter with great potential. He is currently on the Lieutenant's list and has served in an acting Lieutenant position many times this past year. I have confidence in his abilities on the emergency scene." (*Id.* ¶ 121.) In addition, Plaintiff received positive comments regarding Plaintiff's care on patient surveys. (*Id.* ¶¶ 129-30.)

**C.** ***Plaintiff's Union Activity***

After joining the fire department, Plaintiff joined the Mount Prospect Fire Fighter's Association ("Association"), which was a local organization comprised of Mount Prospect firefighters. (*Id.* ¶¶ 2-3.) Officers in the fire department (*i.e.*, Lieutenants, Captains, Deputy Chief,

3

and Chief) were also members of the Association, but their membership was limited to attending social engagements; they were not allowed at Association meetings, and the Association did not negotiate on their behalf. (*Id.* ¶¶ 14-15.)

## 1.     **Wages and Benefits**

Plaintiff was elected to the executive board of the Association in 1993. (*Id.* ¶ 6.) In 1990, Plaintiff was elected to the Association's Wage Committee, and in 1997, he became Chairman of the Wage Committee. (*Id.* ¶¶ 5-6.) Prior to 2000, the Association and the Village met about every three years, for a period of three to four months, to negotiate a new wage agreement. (Defs.' 56.1(a)(3) ¶¶ 24-25.) The Village was represented in wage negotiations by the Assistant Village Manager, Human Resource Director for the Village, a Village attorney, and the Fire Chief. (*Id.* ¶ 26.) The Board was not involved in negotiations. (*Id.* ¶ 27.) Plaintiff participated in negotiating new wage agreements on behalf of the Association in 1991, 1994, and 1997. (*Id.* ¶¶ 29-30; Pl.'s LR 56.1(b)(3)(B) ¶¶ 39-40.) At least one of Plaintiff's fellow Wage Committee members characterized him as a "bull dog," and he was generally known as an aggressive wage negotiator. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 11-12, 37; Defs.' LR 56.1(a)(3) ¶ 42.)

Plaintiff was strongly in favor of and very involved with organizing the firefighters to join the International Association of Fire Fighters ("IAFF"), an international union affiliated with the AFL-CIO. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 16-18.) One of the reasons Plaintiff wanted to affiliate with the IAFF is that he believed it would allow the firefighters to negotiate a lengthier written contract including additional terms and conditions of employment, including pension benefits and matters covered by the Village's personnel rules. (*Id.* ¶¶ 21-26; Pl.'s LR 56.1(b)(3)(A) ¶¶ 45-46.) In 2000, the Association voted to join the IAFF. (Pl.'s LR 56.1(b)(3)(A) ¶ 43.)

Plaintiff believed that the Mount Prospect village managers, as well as the Chiefs and Deputy Chiefs of the fire department, were not in favor of a lengthier written contract or of the firefighters associating with the IAFF. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 27-31, 33-35.) Former Chief Cavello testified that he did not think it was necessary for the firefighters to join the IAFF. (*Id.* ¶ 32.) Plaintiff stated that Cavello advised him that it would not be to Plaintiff's benefit to join the IAFF. (*Id.* ¶ 36.)

### 2.   Safety Issues

At various times between 1990 and 2001, Plaintiff (among other union members) addressed a number of safety issues with management in his capacity as a member and/or President of the Wage Committee: (1) the "manning issue," which concerned the number of men assigned to a particular apparatus (e.g., fire engine, fire truck) (*id.* ¶¶ 41-51); (2) the physical validation test, which had allegedly injured several individuals (*id.* ¶ 59); (3) the "paramedic opt-out," which would allow firefighter/paramedics to drop their paramedic status and specialize in other areas (*id.* ¶¶ 60-61); (4) allowing firefighters to wear T-shirts instead of uniform shirts for emergency calls on hot days (*id.* ¶¶ 69-78); (5) the Computer Aided Reporting System ("CARS") for ambulance run reports, which had several problems, and which some firefighters believed caused delays in returning to service after responding to an emergency call (*id.* ¶¶ 79-84); (6) concerns about putting on neighborhood block parties for public relations, because during the parties, some residents would become intoxicated and climb on the fire trucks, and firefighters were concerned about difficulty in getting their equipment out at times (*id.* ¶¶ 85-94); and (7) occasionally using "paid-on-call" ("POC") firefighters, who do not have the extensive training of full-time firefighters, to cover the shift of a sick firefighter, instead of using "hire-backs," which is a full-time firefighter from a different shift (*id.* ¶¶ 95-104).

Plaintiff claims he met with resistance from management over these safety issues. Specifically, in negotiations regarding the manning and paramedic opt-out issues, former Chief Cavello said that Plaintiff should not tell him how to run his department. (*Id.* ¶¶ 47-48, 67.)

### 3. Organizing Lieutenants

Plaintiff was very vocal that he would attempt to organize the Lieutenants into a union if he were promoted to Lieutenant. (*Id.* ¶¶ 105, 109.) Plaintiff claims that many Lieutenants had expressed to him that they did not believe it was necessary to organize, and some were concerned that if they organized, they would lose certain benefits because they would no longer be considered management. (*Id.* ¶¶ 106-07.) In 2001, Chief Figolah allegedly told Plaintiff that it "was not acceptable" for him to organize the Lieutenants into a union, and Captains Livingston and Huemann testified that they did not see a reason for the Lieutenants to organize. (*Id.* ¶¶ 108, 110.)

## D. *Lieutenant Testing Process*

Firefighters who wish to be promoted to Lieutenant must successfully complete a screening and examination process to be placed on a promotional eligibility list. (Defs.' LR 56.1(a)(3) ¶ 49.) On average, only one out of four applicants will make the Lieutenant eligibility list. (*Id.* ¶ 176.) Before 2000, no more than twenty applicants could be placed on the promotion eligibility list; after 2000, no more than eight applicants could be placed on the list. (*Id.* ¶ 50.) When a Lieutenant position became available, the name at the top of the eligibility list was invariably chosen to fill the opening, and so on, in rank order down the list during the three years the list remained active. (*Id.* ¶¶ 52-53; Pl.'s LR 56.1(b)(3)(B) ¶¶ 258, 265.)

The promotional testing process consisted of two parts, a pre-screening process and an Assessment Center. (Defs.' LR 56.1(a)(3) ¶ 54.) In 1994 and 1997, failure to score eighty percent

or better in each pre-assessment phase would preclude an applicant from moving on to the Assessment Center. (*Id.* ¶¶ 55-56.) In 2001, a candidate could not move on to the Assessment Center if he failed to score in at least the eightieth percentile after combining the total scores for each part of the pre-screening phase of the examination. (*Id.* ¶ 57.) In the Assessment Center phase, an independent agency, the Illinois Fire Chiefs Association Fire Service Bureau, tested the candidates in three scenarios designed to assess the candidates regarding leadership, administrative skills, oral and written skills, ability to function in emergency situations, ability to supervise subordinates, and ability to perform functions in conformity with the department's policies and procedures. (*Id.* ¶ 84.) No internal persons from the department evaluated the candidates during the Assessment Center phase. (*Id.* ¶ 85.)

The pre-screening process consisted of written examinations on general knowledge and local knowledge; a fireground simulation; and a Merit and Efficiency evaluation. (*Id.* ¶ 59.) Applicants were also given a writing exercise. (*Id.* ¶ 60.)

The Merit and Efficiency evaluation included a "forced matrix" system by which Captains would rank each applicant relative to every other one from first to last. (*Id.* ¶ 61.) Each candidate's name was listed in a column on the left-hand side of a chart and in a row on top of the chart. (*Id.*) The evaluating Captains would compare each person to the other and would place an arrow pointing to the person that compared better. (*Id.*) After the matrix was completed, the arrows pointing to each person were added up. (*Id.*) The person with the most arrows pointing to him received the highest Merit and Efficiency ranking and so on. (*Id.*) The three evaluating Captains had to agree unanimously when ranking applicants' Merit and Efficiency scores. (*Id.* ¶ 68; Pl.'s LR 56.1(b)(3)(B) ¶ 297; .) The categories for which the Captains provided Merit and Efficiency scores included

emergency performance, teamwork, leadership, initiative, and job knowledge. (Defs.' LR 56.1(a)(3) ¶ 67.) The Chief had no role in evaluating candidates for Merit and Efficiency. (*Id.* ¶ 78.)

After all testing was completed and the Captains had determined the Merit and Efficiency scores, the Chief submitted the list of qualified candidates to the Board, which approved the list. (*Id.* ¶ 86.) The Board then prepared the rankings after calculating all relevant scores. (*Id.*) The Board was responsible for establishing and administering the Lieutenant promotional process, but it was not involved in evaluating participants in the process. (*Id.* ¶ 47; Pl.'s LR 56.1(b)(3)(B) ¶ 229.) The Board approved the Lieutenant promotional testing processes to be used in 1994, 1997, and 2001. (Defs.' LR 56.1(a)(3) ¶ 48.) The Merit and Efficiency evaluation system was developed to evaluate attributes of firefighters seeking a promotion in a fair and reasoned manner. (*Id.* ¶ 63.) The criteria used in the Merit and Efficiency evaluation system are job-related, and the methodology applied is appropriate. (*Id.* ¶ 64.)

### 1. <u>1994 Testing Process</u>

In 1994, Plaintiff, along with twenty other applicants, participated in the Lieutenant promotional process. (*Id.* ¶ 96.) Plaintiff scored 97.20 points out of 100 on the written portion of the examination, which was the third highest score that year. (Pl.'s LR 56.1(b)(3)(B) ¶ 150.)

The Merit and Efficiency portion of the test was scored by Captain Kordecki, Captain Thill, and defendant Captain Livingston. (*Id.* ¶ 153.) Plaintiff received 12.6 out of 30 Merit and Efficiency points, which ranked him tied for fourteenth out of the twenty-one candidates. (*Id.* ¶ 151.) Plaintiff's overall pre-screening process score was a combined average of 77.98%, which did not satisfy the minimum requirement of 80%, so he was ineligible to proceed on to the Assessment Center. (*Id.* ¶ 152; Defs.' LR 56.1(a)(3) ¶ 98.)

At some point after taking the test, Plaintiff reviewed his results with then-Chief Cavello, who told Plaintiff he scored very poorly on the "Teamwork" section of the Merit and Efficiency scores, which was the most heavily weighted section. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 154-55.) Plaintiff believed at that time that he scored poorly on the Merit and Efficiency portion of the test due to his involvement with the union, in particular his work in collective bargaining. (*Id.* ¶ 156.) Plaintiff believed that others who made the Lieutenant eligibility list were not union advocates and were not as vocal about joining the IAFF as he was. (*Id.* ¶ 165.) Plaintiff decided not to pursue a lawsuit in 1994, however, electing instead to wait until he took another promotion test and "see what happens." (*Id.* ¶ 157.) Plaintiff told others that he would probably file a lawsuit if he did not make the Lieutenant eligibility list after the next test. (*Id.* ¶ 158.)

### 2.     1997 Testing Process

Plaintiff took a second Lieutenant promotional examination in 1997 along with eighteen other candidates. (*Id.* ¶ 169; Defs.' LR 56.1(a)(3) ¶ 107.) In 1997, the examination process was changed somewhat from 1994. In 1994, all candidates who took the written examination were evaluated under the forced matrix system for Merit and Efficiency. (Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 173.) In 1997, however, only those who passed the written examination were to be evaluated under the forced matrix system. (*Id.*)

The written examination was administered and scored by a third party, Dr. Tyler. (Defs.' LR 56.1(a)(3) ¶ 108.) Only two candidates, including Plaintiff, originally passed the written examination. (Pl.'s LR 56.1(b)(3)(B) ¶ 188.) The 1997 testing process included an appeals system, whereby test takers could appeal the scoring of individual questions to Dr. Tyler. (*Id.* ¶ 189; Defs.' LR 56.1(a)(3) ¶¶ 109-12.) The Village paid extra for the appeal service, and the Board approved Dr.

Tyler's process allowing candidates to challenge answers to the written examination. (Defs.' LR 56.1(a)(3) ¶¶ 110, 113.)

After the examination, a few test takers protested the scoring of a number of questions as to which the "correct" answers conflicted with local policy. (*Id.* ¶¶ 115-16; Pl.'s LR 56.1(b)(3)(B) ¶¶ 190, 201.) Dr. Tyler heard the appeals and conferred with Chief Figolah and Captain Huemann, at least in part to confirm that the answers at issue did conflict with local policy. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 196-97, 199-200.) After hearing the appeals, Dr. Tyler decided to accept additional "correct" answers for a total of eight questions. (*Id.* ¶ 190; Defs.' LR 56.1(a)(3) ¶ 117.) Three other candidates, Juliano, Straub, and O'Neill, then scored high enough to pass the written examination. (Pl.'s LR 56.1(b)(3)(B) ¶ 202; Defs.' LR 56.1(a)(3) ¶ 118.)

The Merit and Efficiency portion of the 1997 test was scored by defendant Captain Livingston, Captain Thill, and defendant Captain Dawson. (Pl.'s LR 56.1(b)(3)(B) ¶ 171.) Captains Livingston and Thill also scored Plaintiff's Merit and Efficiency portion in 1994. (*Id.* ¶ 172.) In order to pass the Merit and Efficiency portion's forced matrix system, a candidate had to rank at the eightieth percentile, at a minimum. (*Id.* ¶¶ 232-33.) Because only five candidates were to be evaluated, the forced matrix system would allow just one person to achieve the required eightieth percentile and move on to the Assessment Center. (Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 173.) The Captains decided to curve the scores in such a way that all five candidates who passed the written portion of the examination passed the Merit and Efficiency portion as well. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 184, 224-27.) In addition, the Captains gave all candidates a perfect score on a separate writing exercise. (*Id.* ¶¶ 183, 236-44.)

If the scores of the writing exercise and the Merit and Efficiency portion of the examination had not been calculated in this way, Plaintiff would not have been allowed to proceed in the testing process to the Assessment Center. (*Id.* ¶¶ 182-83, 245.) In the Assessment Center, the Illinois Fire Chiefs Association Fire Service Bureau ranked Plaintiff third out of the five candidates tested. (Defs.' LR 56.1(a)(3) ¶ 122.)

The Chairman of the Board of Police and Fire Commissioners added up the final scores, with Chief Cavello and Deputy Chief Figolah present during the tally. (Pl.'s LR 56.1(b)(3)(B) ¶ 246.) After the scores were tallied, Plaintiff ranked fourth out of the five candidates, all of whom were ultimately placed on the Lieutenant eligibility list. (*Id.* ¶¶ 170, 177; Defs.' LR 56.1(a)(3) ¶ 121.)

After the 1997 process was completed, Captain Livingston encouraged Plaintiff to go to school, become more involved in the department and department projects, and align himself with the current department managers. (Pl.'s LR 56.1(b)(3)(B) ¶ 251.) Captain Livingston testified that he believed everyone on the current list would be promoted, but if Plaintiff were not promoted off the list, he would be in a better position to earn Merit and Efficiency points the next time. (Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 251.) Plaintiff claims that Captain Livingston told him that he was perceived as being "synonymous with the union," and the Lieutenants thought of him as "too overzealous" in his union activities. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 252-53.)

During the 1997 examination process, Plaintiff believed that the scores of the written examination were manipulated to add the three additional candidates to the list, in order to push Plaintiff's name further down the list to ensure he would not be promoted. (*Id.* ¶¶ 175, 178.) Plaintiff felt the three candidates were added to the promotion list because of discrimination related to Plaintiff's union advocacy. (Defs.' LR 56.1(a)(3) ¶ 130.) It was Plaintiff's opinion that the three

11

candidates were not actively involved in advocating union issues. (Pl.'s LR 56.1(b)(3)(B) ¶ 176.) At the same time, Plaintiff believed that the scores of the Merit and Efficiency portion of the examination were manipulated in his favor to put him on the eligibility list and "shut him up," because management was afraid Plaintiff would file a lawsuit if he did not make the list. (*Id.* ¶¶ 185-86.)

### 3.   <u>Extension of 1997 Lieutenant List</u>

A Lieutenant eligibility list naturally expires after three years. (*Id.* ¶ 258.) Therefore, the 1997 list that included Plaintiff's name was scheduled to expire on May 31, 2000. (*Id.* ¶ 259.) During the three-year period from the posting of the eligibility list, only two Lieutenant positions became available. (Defs.' LR 56.1(a)(3) ¶ 125.) At some point around the time the list was due to expire, Chief Figolah asked the Board of Police and Fire Commissioners to extend the term of the list. (Pl.'s LR 56.1(b)(3)(B) ¶ 260.) Chief Figolah claimed that he asked for the list to be extended for six months because there was an expected opening for Training Captain, and he anticipated that a current Lieutenant could be promoted to that position. (Defs.' LR 56.1(a)(3) ¶ 127.) In that case, a vacant Lieutenant position would be created, but there would be no list from which to fill the vacancy, since the next Lieutenant's examination process was not scheduled to begin until approximately January 2001. (*Id.*)

By fall 2000, Chief Figolah was aware that three new Lieutenant positions would open up at the beginning of 2001. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 266, 270-71.) On December 13, 2000, Chief Figolah asked the Board to cancel the eligibility list. (*Id.* ¶ 266.) The minutes from the December 13, 2000 Board meeting reflect that the Board had voted to extend the list "indefinitely" but that it had also voted to terminate the list effective December 13, 2000. (*Id.* ¶ 262.) The following day,

Chief Figolah sent an e-mail to the three remaining candidates whose names were on the 1997 list, including Plaintiff. (*Id.* ¶ 268.) At the time the eligibility list was terminated, Plaintiff's name was second on the list. (*Id.* ¶ 272.) No vacancy occurred during the period the eligibility list was extended, from May 2000 to December 2000. (Defs.' LR 56.1(a)(3) ¶ 128.)

## 4.    **2001 Testing Process**

Plaintiff, along with twenty-six other applicants, took the next Lieutenant promotional examination given in January 2001. (*Id.* ¶ 132; Pl.'s LR 56.1(b)(3)(A) ¶ 131.) Plaintiff again received the highest score on the written portion of the examination. (Pl.'s LR 56.1(b)(3)(B) ¶ 279.) However, Plaintiff did not make the eligibility list in 2001 because he did not pass the Merit and Efficiency section. (*Id.* ¶¶ 274, 280-81, 285; Defs.' LR 56.1(a)(3) ¶ 133.) The Merit and Efficiency evaluators for the 2001 examination were defendants Captains Livingston, Dawson, and Huemann. (Pl.'s LR 56.1(b)(3)(B) ¶ 284.) Plaintiff's overall score in the pre-screening process was 69.61%, less than the minimum required 80%, because he received 38.5% (11.57 out of 30 available points) on the Merit and Efficiency evaluation. (Defs.' LR 56.1(a)(3) ¶¶ 134-35.)

Out of the twenty-seven applicants ranked by the forced matrix during the Merit and Efficiency evaluation, Plaintiff ranked twenty-second. (*Id.* ¶ 137.) A maximum of eight individuals could be placed on the eligibility list in 2001, and six made the list. (*Id.* ¶ 139.) The two firefighters besides Plaintiff who had been left on the 1997 list passed the 2001 promotional examination, and both have since been promoted. (*Id.* ¶ 141; Pl.'s LR 56.1(b)(3)(B) ¶¶ 274.)

Among the reasons Plaintiff states he was given low Merit and Efficiency scores were: (1) he did not support the goals of the department (*id.* ¶ 298); (2) he was not happy with the CARS computer system (*id.* ¶ 301-02); (3) he was outspoken about this belief that firefighters should not

13

have to attend block parties (*id.* ¶¶ 303-04); (4) he did not respect the department's dress code, lobbying against the requirement that firefighters wear button-down shirts instead of T-shirts to emergency calls (*id.* ¶¶ 305-06); (5) his opinion that firefighters/paramedics should transport patients to the nearest hospital, rather than to the hospital of the patient's choice (*id.* ¶¶ 307-10); (6) he made a POC firefighter feel poorly because Plaintiff wanted to be teamed with a full-time firefighter/paramedic instead (*id.* ¶¶ 311-14); and (7) he had a negative attitude and could be confrontational (*id.* ¶ 315.)

In addition, the Lieutenants ranked Plaintiff very low on leadership, twelve steps lower than the Captains ranked him, and the Lieutenants gave Plaintiff the lowest possible score (1 out of 4) on teamwork. (Defs.' LR 56.1(a)(3) ¶ 138(a)-(b).)  Captains testified to other negative marks against Plaintiff, including an incident in which he refused to get off the phone to participate in a required drill (*id.* ¶ 138(c)); a patient's complaint that Plaintiff was rude to her and made her stand while she had leg pain (*id.* ¶ 138(d)); Plaintiff's reputation for taking shortcuts (*id.* ¶ 138(e)); his complaints that the CARS system was "difficult" and the "program is bullshit" (*id.* ¶ 138(f)); Plaintiff's belief that attending public relations block parties was "bullshit" (*id.* ¶ 138(g)); an incident in which Plaintiff complained that a police officer had called advanced life support for a knee injury (Pl.'s LR 56.1(b)(3)(A) ¶ 138(i)); Plaintiff's concern about starting IVs on AIDS patients (Defs.' LR 56.1(a)(3) ¶ 138(k)); Plaintiff's reputation of "being a complainer, being negative, being self-centered, pessimistic . . .," (Pl.'s LR 56.1(b)(3)(A) ¶ 138(m)); Plaintiff's criticism of patients who called 911 for what he felt were non-emergencies (Defs.' LR 56.1(a)(3) ¶ 138(o); Plaintiff's failure to promote the team concept by the way he dealt with disputes unrelated to him or his shift (*id.* ¶ 138(q)); one evaluator's belief that Plaintiff had a negative attitude about training (*id.* ¶ 138(s)); and Plaintiff's

refusal to take recommended firefighter and leadership classes to make him a stronger candidate for promotion, because Plaintiff did not have time due to his work on a side job (*id.* ¶¶ 138(z), 145-47).

Plaintiff contends that by 2001, the firefighters had voted to join the IAFF and were in the process of negotiating a new lengthier contract. (*Id.* ¶ 283.) Plaintiff claims to have "confirmed" that none of the individuals who made the 2001 eligibility list were actively involved in pushing for the firefighters to join the IAFF. (Pl.'s LR 56.1(b)(3)(A) ¶ 142.) Plaintiff told Chief Figolah in April 2001 that he believed he would not be promoted due to his union activity. (Defs.' LR 56.1(a)(3) ¶ 149.)

Plaintiff maintains that all of the issues for which he was graded lower on Merit and Efficiency points related to matters Plaintiff addressed to the department administration in his capacity as a member of the Wage Committee. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 301-14.) Plaintiff argues that it would be improper to consider any of his actions relating to matters he addressed as a union member. (Pl.'s LR 56.1(b)(3)(A) ¶ 155.)

## E.   *Negative Sick Time*

"Negative sick time" was a policy by which firefighters who had exhausted their accrued sick leave could "borrow" sick time before it was accrued, and pay back the time when they were able to work. (Pl.'s LR 56.1(b)(3)(B) ¶ 319; Defs.' LR 56.1(a)(3) ¶ 177.) Chief Figolah ended the negative sick time policy when he became Chief in March 1998. (Pl.'s LR 56.1(b)(3)(B) ¶ 327; Defs.' LR 56.1(a)(3) ¶ 177.) Since the policy was rescinded, however, two or three individuals were apparently allowed to take negative sick time. (Pl.'s LR 56.1(b)(3)(B) ¶ 322.)

In 2000, Plaintiff had an off-duty accident that prevented him from working for six months. (*Id.* ¶ 316.) The Village informed Plaintiff that after his medical leave expired, he would either have

to go on a pension or find an Americans with Disabilities Act position. (*Id.* ¶ 317.) Plaintiff then requested negative sick time, but his request was denied. (*Id.* ¶¶ 318-20.) Nevertheless, Plaintiff continued to receive his regular income because fellow firefighters volunteered to work to cover Plaintiff's unpaid days off. (*Id.* ¶¶ 320-21; Defs.' LR 56.1(a)(3) ¶ 183.) Chief Figolah worked for Plaintiff on Christmas Day. (Defs.' LR 56.1(a)(3) ¶ 184.)

In 2003, Plaintiff suffered another off-duty injury, again requested negative sick time, and his request was again denied. (*Id.* ¶¶ 335-37.) The record does not reflect how Plaintiff's time off due to injury was handled in this instance.

## F.   *Procedural History*

In 2002, Plaintiff brought suit against the Village of Mount Prospect, the Board of Fire and Police Commissioners of the Village of Mount Prospect, Chief Michael Figolah, Captain Charles Livingston, Captain Henry Dawson, and Captain Anthony Huemann. Plaintiff's complaint alleged a claim against the municipal defendants and the individual defendants in their official capacities under 42 U.S.C. § 1983 for retaliation in violation of his First Amendment rights of free speech and association and in violation of his equal protection rights under the Fourteenth Amendment; intentional discrimination in violation of 42 U.S.C. § 1983 against the individual defendants in their individual capacities; and indemnification against the Village.

Defendants filed motions to dismiss, which this Court granted in part and denied in part on November 18, 2002. Count III's indemnification claim was dismissed on the basis that it failed to state an independent claim, and the official capacity claims against the individual defendants were dismissed as redundant of the claims against the Village. The motions to dismiss were denied,

however, with respect to the arguments that the complaint failed to state a claim and was barred by the statute of limitations and that the individual defendants are entitled to qualified immunity.[1]

## DISCUSSION

### I.   SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).  The summary judgment standard "is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996).  In addition, "[c]onclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th

---

[1] The issue of qualified immunity was appealed to the Seventh Circuit, which heard oral argument on the issue three days after the present motions for summary judgment were filed.  It is appropriate for this Court to continue proceedings despite the appeal because there is no stay in place and because a factual review demonstrates that summary judgment is required as a matter of law.

Cir. 2002). Similarly, affidavits or depositions based on speculation, rumor, or conjecture are not

sufficient to defeat a properly supported motion for summary judgment. *Karazanos v. Navistar Int'l*

*Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). Finally, the Court is "'not required to draw every

conceivable inference from the record,'" *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)

(citation omitted), nor must it "scour the record in search of evidence to defeat a motion for summary

judgment." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 n.4 (7th Cir. 2002) (citation and internal

quotation omitted).


## II.    <u>STATUTE OF LIMITATIONS</u>

Defendants argue that Plaintiff's claims related to the 1994 and 1997 testing processes are

barred by the two-year statute of limitations for section 1983 actions in Illinois. *See Eison v. McCoy*,

146 F.3d 468, (7th Cir. 1998). "A discrete retaliatory or discriminatory act 'occurred' on the day that

it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). If a plaintiff

knew that each discrete employment action was discriminatory and harmed him, he was obligated

to sue over the act within the statute of limitations. *See Jones v. Merchants Nat'l Bank & Tr. Co.*,

42 F.3d 1054, 1058 (7th Cir. 1994) (noting that plaintiff admitted she felt that some refusals to

promote were discriminatory at the time they occurred).

In this case, the promotion decisions and testing processes were discrete acts, Plaintiff was

aware of the decisions made at the time, and Plaintiff even admitted he believed at the time the

decisions were made that he was the victim of discriminatory retaliation. As a result, application of

the statute of limitations would bar Plaintiff's claims of discrimination in 1994 and 1997. *See id.*

Plaintiff, however, argues that his claims are not barred, relying on the theories of continuing violation and equitable tolling. Plaintiff argues first that while he "suspected" retaliation in 1994, he did not have evidence at the time to connect his union activity with the failure to promote. He did not realize until after the 2001 testing process that "he had been the victim of ongoing retaliation." Second, Plaintiff urges that Defendants should be estopped from asserting the statute of limitations defense because they took affirmative steps to delay Plaintiff's suit in 1997 and prevented Plaintiff from knowing his injury by "manipulat[ing]" his Merit and Efficiency scores in 1997 to put his name on the eligibility list. Plaintiff argues that although he had problems with the irregularities with the process in 1997, he had every expectation of being promoted until the end of 2000, when the Board expired the 1997 list after extending it for six months.

The doctrine of equitable tolling allows a plaintiff to avoid the statute of limitations bar if, despite the plaintiff's due diligence, he could not obtain information bearing on the existence of his claim. *See Smith v. City of Chicago Heights*, 951 F.2d 834, 839 (7th Cir. 1992). In this case, none of Defendants' actions prevented Plaintiff from learning of the existence of a possible claim for retaliation in 1997. Plaintiff admits that at the time the test was administered, he believed the scores were changed in retaliation for Plaintiff's union activity.

Continuing violations are only recognized where (1) the employer's decisionmaking process takes place over a period of time, making it difficult to pinpoint the precise day of the violation; (2) the employer is alleged to have an open and systematic discriminatory policy; or (3) the employer's discriminatory acts are "so covert" that the plaintiff is not immediately aware of their discriminatory character. *See Place v. Abbott Labs.*, 215 F.3d 803, 808 (7th Cir. 2000); *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 353 (7th Cir. 2002) ("A plaintiff 'may not base her suit on conduct that

19

occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct.'") (alteration omitted).

Plaintiff tries to argue that Defendants' actions were covert because Plaintiff allegedly only learned of the pattern of discrimination in 2001. However, "[t]he covert variant applies to plaintiffs who realize only with the benefit of hindsight that they were discriminated against." *Place v. Abbott Labs.*, 215 F.3d 803, 808 (7th Cir. 2000); *see also Dasgupta v. Univ. of Wisc. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997) ("A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.").

In this case, the failure to promote Plaintiff in 1994 was "a single, significant event," and the 1997 scoring change was not covert. Moreover, Plaintiff admits he believed in both 1994 and 1997 that he had been unlawfully discriminated against on the basis of his union activity. It is irrelevant, therefore, that he may not have had the benefit of all facts related to the alleged retaliation at the time, or that he did not realize in 1994 that the alleged retaliation would occur again. The continuing violation doctrine does not salvage his claims.

Plaintiff's claims of discrimination based on events occurring in 1994 and 1997 are therefore barred by the statute of limitations as a matter of law. Contrary to Defendants' assertions, however, this does not mean that all evidence prior to 2000 is barred from consideration. To the extent that employment decisions Defendants made in 2001 related to incidents that occurred before 2000, evidence relating to the earlier incidents is relevant and will be considered for the purposes of the present motions for summary judgment.

## III.     FIRST AMENDMENT RETALIATION

Plaintiff alleges the following acts of retaliation that are not barred by the statute of limitations: (1) the decision to terminate the 1997 eligibility list in December 2000; (2) the calculation of the 2001 Merit and Efficiency scores; and (3) the refusal to allow Plaintiff to take negative sick time in 2000 and 2003. The Court will now turn to the question of whether these claims may be submitted to a jury or whether the evidence in the record demands that summary judgment be awarded.

It is undisputed that a State may not retaliate against an employee if that retaliation would infringe the employee's constitutionally protected freedom of speech. *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000). A section 1983 claim alleging retaliation in violation of the First Amendment requires a three-step analysis: "First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiff's constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment." *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999); *see also Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (explaining that if defendants meet their burden of showing they would have taken the same action in the absence of the exercise of First Amendment rights, the plaintiff then "bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that retaliation was the real reason for the defendants' action"). Each of these steps will be discussed in turn.

## A.    *Constitutionally Protected Speech*

Although this inquiry requires the Court to make certain predicate factual determinations, whether speech is protected under the First Amendment is a question of law for the Court to determine. *See Kokkinis*, 185 F.3d at 843; *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). This analysis looks to two separate factors. The first is whether the plaintiff's speech related to a matter of "public concern." *Kokkinis*, 185 F.3d at 843-44 (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). If the speech does relate to a matter of public concern, "the court must then apply the *Pickering* balancing test to determine whether 'the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern' outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.*

### 1.    **Matter of Public Concern**[2]

The Village and individual defendants argue that Plaintiff's participation in wage negotiations and anti-management speech is not a matter of public concern protected by the First Amendment. Plaintiff responds that retaliating against employees for union activities violates the First Amendment, and Plaintiff's speech addressed safety issues as well as wages and benefits.

The fact that the topic at issue may be of public importance does not, by itself, mean that the statements address a matter of public concern for the purposes of a First Amendment retaliation

---

[2] In hybrid speech/association cases such as this one, where the issue is retaliation for speaking out on union-related matters, "the public concern standard should be applied while recognizing that there may be distinctions when applying it to conduct that also involves associational rights." *Berry v. Ill. Dep't of Human Servs.*, No. 00 C 5538, 2003 WL 22462547, at *11 (N.D. Ill. Oct. 29, 2003); *see also Griffin v. Thomas*, 929 F.2d 1210, 1213 (7th Cir. 1991) (holding that the public concern analysis applies to both freedom of association and freedom of speech cases).

claim. *Id.* at 844. Instead, the court must look at "'the precise content, form, and context of speech that admittedly may be of some interest to the public.'" *Id.* (quoting *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994)). Relevant questions include whether the point of the speech was to raise issues of public concern or to further a purely private interest. *Id.* The content of the speech is the most important factor in the inquiry. *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990) (citation omitted); *see Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir. 2000).

Issues of public safety "are generally a matter of public concern." *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002) (citing *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (*en banc*)). Furthermore, while a public employer has no obligation to negotiate with unions, public employees are generally protected from adverse employment decisions for engaging in "union activities," including "advocacy and persuasion in organizing the union and enlarging its membership." *See Hanover Twp. Fed. of Teachers Local 1954 (AFL-CIO)*, 457 F.2d 456, 460 (7th Cir. 1972); *see also Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999) ("There is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."); *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995) (noting that union-organizing efforts have been recognized, in a broad sense, as relating to matters of public concern).

Nevertheless, all union-related speech does not *per se* relate to a matter of public concern. *See Gregorich*, 54 F.3d at 415 (citing *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985)); *see also Hanover Twp.*, 457 F.2d at 460 ("It does not follow, however, that all activities of a union or its members are constitutionally protected.").

Plaintiff claims that every time he addressed an issue with the fire department administration, he did so on behalf of the union, in his capacity as a member of the Wage Committee, and therefore his speech is a matter of public concern. Plaintiff, however, stretches the definition of public concern too thin with regard to some of the speech he avers is protected. For example, Plaintiff describes an incident when now-Lieutenant Juliano was accused of stealing some bread from other firefighters, and defendant Captain Huemann was responsible for resolving the situation. Later, firefighters allegedly asked Plaintiff, "in his capacity as a member of the Wage Committee," to complain to Captain Huemann about the way the situation was handled, and Plaintiff did. (Pl.'s LR 56.1(b)(3)(A) ¶ 138(q).) Even if the firefighters had approached Plaintiff as a union member, that would not magically cloak his speech with constitutional protection. A dispute over food cannot reasonably be considered a matter of public concern. Nevertheless, the bulk of the speech on which Plaintiff bases his retaliation claims does relate to union activities and/or safety issues, both of which are matters of public concern.

## 2. *Pickering* Balancing Test

Even if speech relates to a matter of public concern, it is not constitutionally protected unless the plaintiff's First Amendment interests outweigh the public employer's interests in providing services efficiently. Factors to be considered when balancing the employee's and employer's relative interests include: "'(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on

which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.'" *Kokkinis*, 185 F.3d at 845 (citation omitted). The second factor is particularly important: "'When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.'" *Connick*, 461 U.S. at 151-52. "[I]f the speech at issue arose from a dispute over application of a particular policy to the speaker, some weight would have to be given to an employer's reasonable view that 'the employee [had] threatened the authority of the employer to run the office.'" *Breuer v. Hart*, 909 F.2d 1035, 1040 (7th Cir. 1990) (quoting *Connick*, 461 U.S. at 153). An employer need not wait until disruption of the office and of working relationships actually occurs before taking action. *See Connick*, 461 U.S. at 153.

Moreover, public safety employers, such as the fire department, are given a wide degree of latitude in balancing their unique interests in maintaining order in the ranks: "'The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to 'considerable judicial deference.'" *Kokkinis*, 185 F.3d at 845-46 (quoting *Tyler v. City of Mountain Home*, 72 F.3d 568, 570 (8th Cir. 1995)); *see also Breuer*, 909 F.2d at 1041 ("Speech that might not interfere with work in an environment less dependent on order, discipline, and *esprit de corps* could be debilitating to a police force. Such considerations are permissible in weighing constitutional violations.").

In this case, it might be reasonable to assume that certain elements of Plaintiff's speech were sufficiently disruptive that the government's interest in promoting efficiency outweighed Plaintiff's speech rights. For example, some of the speech for which Plaintiff claims First Amendment protection amounts to little more than vulgar conclusory complaints or making other employees feel

badly. As a result, Defendants could well have concluded that some of Plaintiff's speech was disruptive to the department's authority and not worthy of constitutional protection. Defendants, however, have failed to develop the record in this regard and offer no specific evidence that they were concerned about the potential impact of Plaintiff's speech at the time they reacted to it. Therefore, we cannot conclude at the summary judgment stage that Plaintiff's speech is not protected under the *Connick/Pickering* balancing test. *See Gustafson v. Jones*, 290 F.3d 895, 909-10 (7th Cir. 2002) ("First Amendment rights cannot be trampled based on hypothetical concerns that a governmental employer never expressed.").

### B.    *Substantial or Motivating Factor*

After establishing that the speech at issue is constitutionally protected, Plaintiff must next demonstrate that retaliation was the substantial or motivating factor in the defendants' negative employment action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Board argues that there is no evidence in the record that it or any of its members retaliated against Plaintiff in the testing process. The Village and individual defendants assert that the Merit and Efficiency screening process was not discriminatory.

Plaintiff alleges Defendants committed the following acts of retaliation: (1) terminating the 1997 Lieutenant promotional list two weeks before he would have been promoted; (2) taking his union involvement and advocacy into consideration in awarding Merit and Efficiency points in the Lieutenant promotional process; and (3) denying him negative sick time in 2000 and 2003 despite the fact that other firefighters were granted negative sick time. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 11, 129.)

In order to prove retaliation, it is not enough to show that the defendant "welcomed" the end of the protected activity "or even that such activity played some minor role in the [adverse

employment] decision.'" *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (citations omitted); *see O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1369 (7th Cir. 1993). However, the plaintiff also does not have the onerous burden of showing that retaliatory motive was the sole reason for the defendant's actions. *See Rakovich*, 850 F.2d at 1190. The plaintiff's burden is to show that "'*had it not been for the violation*, the injury of which he complains would not have occurred . . . .'" *Id.* (citations omitted) (emphasis in original).

This Court cannot presume retaliation on the sole basis that (1) Plaintiff engaged in protected speech and (2) suffered an adverse employment decision. If retaliatory motive could be inferred on the basis of union activity alone, that "would effectively preclude summary judgment in all cases where [union activists] bring suit alleging unconstitutional retaliation." *O'Connor*, 985 F.2d at 1368; *see also Chicago Tribune Co. v. Nat'l Labor Relations Bd.*, 962 F.2d 712, 717 (7th Cir. 1992) ("[N]either an employee's union activism nor an employer's knowledge of that activism constitutes sufficient evidence for a finding of antiunion animus.").

Moreover, retaliation cannot be inferred from a defendant's anger toward the plaintiff: "[E]ven if a defendant was 'brimming over with unconstitutional wrath' against the plaintiff, a § 1983 plaintiff cannot prevail unless he or she can establish that the challenged action would not have occurred 'but for' the constitutionally protected conduct." *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 482 (7th Cir. 1995) (quoting *Button v. Harden*, 814 F.2d 382, 383 (7th Cir. 1987)); *see Thomsen v. Romeis*, 198 F.3d 1022, 1028 (7th Cir. 2000). Finally, circumstantial evidence of a person's prohibited motive is irrelevant if that person is not a decisionmaker. *See Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003).

### 1.    **Board**

Plaintiff points to no evidence in the record that the Board retaliated against him due to his union activities. There is no evidence that the Board was even aware of Plaintiff's union activities, let alone that it was biased against him or took any retaliatory actions against Plaintiff. *See* *O'Connor*, 985 F.2d at 1370 ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech."). Moreover, it is unrebutted that the Board did not communicate a bias against Plaintiff to anyone, and the Board did not direct anyone to discriminate or retaliate against Plaintiff for his union activity. (Defs.' LR 56.1(a)(3) ¶¶ 81, 87-92.)

Plaintiff claims that several changes were made to the promotional examination between 1997 and 2001, including: (1) the weight of the written examination was decreased; (2) the weight of the writing exercise was increased; (3) the Village Manager, and not the Captains, graded the writing exercise; (4) candidates were no longer given automatic points for serving as an acting Lieutenant; and (5) the appeals process changed. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 286-89, 291-92.) However, there is no evidence that any of these changes were approved in order to discriminate against Plaintiff. Indeed, Plaintiff has not even shown evidence that these changes negatively affected his promotional scores. The Court concludes that, as a matter of law, no reasonable inference of retaliation on the part of the Board can be drawn. Summary judgment is therefore granted as to all claims against the Board.

### 2. Chief Figolah

Even giving Plaintiff the benefit of an inference that Chief Figolah was anti-union, Plaintiff's claims must fail unless he shows that Chief Figolah retaliated against Plaintiff due to his union activities. While Plaintiff has offered some evidence that Chief Figolah did not agree with the union

on certain issues, he has not shown any evidence of retaliation regarding the 2001 testing process; the application of negative sick time; or the termination in December 2000 of the 1997 eligibility list.

### a.    2001 Testing Process

First, there is no evidence in the record that Chief Figolah retaliated against Plaintiff in the 2001 testing process. The unrebutted evidence in the record shows that Chief Figolah was not a decisionmaker in the 2001 Merit and Efficiency evaluation process, and there is no evidence that he directed or influenced a decisionmaker. (Pl.'s LR 56.1(b)(3)(A) ¶ 171.) Therefore, Plaintiff has failed to show retaliation as a matter of law, and summary judgment will be granted as to all claims against Chief Figolah based on the 2001 testing process.

### b.    Negative Sick Time

Next, Plaintiff offers no evidence even hinting that he was not allowed to take negative sick time as a penalty for enjoying his freedom of speech. Not only has Plaintiff failed to demonstrate retaliation, but even more fundamentally, he has not shown an adverse employment action. It is not disputed that Chief Figolah eliminated negative sick time in 1998, and "enforcing a policy applicable to all employees cannot reasonably be described as a penalty for speech." *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000). Plaintiff claims that three individuals were allowed to take negative sick time after the policy was rescinded and that those individuals have not been outspoken on union issues. The suggested inference is that those three received preferential treatment – and conversely, Plaintiff received retaliatory treatment – based on their union advocacy or lack thereof.

Setting aside the fact that Plaintiff's characterization of the union activities of the three individuals is not supported by anything more than Plaintiff's self-serving affidavit and speculation, the evidence demonstrates that each of the three was awarded negative sick time for reasons wholly

unrelated to his union activity. Two firefighters had accumulated their negative sick time during the previous Chief's administration, and the third was allowed negative sick time by the Finance Department, not by Chief Figolah. (Defs.' LR 56.1(a)(3) ¶ 187-89; Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶¶ 324-26, 328-34.) That employee, who was new, was due to accrue the hours of sick time he used by the time he would receive his paycheck, so the Finance Department did not dock his pay. (Defs.' Resp. Pl.'s LR 56.1(b)(3)(B) ¶¶ 328-34.) The unrebutted evidence in the record demonstrates that no one in the fire department approved or was aware of the Finance Department's actions.

Moreover, Plaintiff admits that he did not miss a paycheck due to the Chief's refusal to award him negative sick time, because other firefighters – including the Chief – volunteered to work on Plaintiff's behalf. Thus, instead of borrowing against his own future sick days, Plaintiff was the recipient of hours "donated" to him by his co-workers. Plaintiff contends that he would have preferred to take negative sick time because he would rather owe sick time to the Village "as opposed to being indebted to a number of individuals." (Pl.'s LR 56.1(b)(3)(B) ¶ 321.) Plaintiff does not explain, however, why his personal qualms about "owing" individuals constitutes an adverse employment action: "'While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.'" *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)); *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995) (holding that the adverse employment action "'must be sufficiently adverse to present an actual or potential danger that the speech of [the plaintiffs] will be chilled.'").

c.      Termination of 1997 Eligibility List

Plaintiff again offers no evidence that Chief Figolah's actions with regard to the termination of the 1997 eligibility list were retaliatory, and the only reasonable inferences to be drawn lead to the conclusion that Chief Figolah's decision had nothing to do with Plaintiff or retaliation for his union activities.

It is not disputed that Chief Figolah could have lawfully allowed the 1997 list to expire in May 2000. It is unreasonable to infer, therefore, that Chief Figolah asked the Board to terminate the list in December 2000 in order to retaliate against Plaintiff, when the Chief had no duty to extend the list to December in the first place. Moreover, if the department never intended to promote Plaintiff, as he contends, it defies logic that Chief Figolah would extend the list for several months (or "indefinitely," as Plaintiff argues) for the sole purpose of terminating the list as soon as a job opening was on the horizon.

The fact that the termination of the list occurred shortly before the Lieutenant positions became open does not, without more, prove retaliation. "'Timing may be an important clue to causation, but does not eliminate the need to show causation.' . . . We have held that absent other evidence of retaliation, a temporal relation is insufficient evidence to survive summary judgment." *Contreras v. Suncast Corp.*, 237 F.3d 756, 758, 765 (7th Cir. 2001) (citation omitted); *see Rasche v. Vill. of Beecher*, 336 F.3d 588, 598 (7th Cir. 2003) ("[T]iming, 'standing alone, does not create a genuine issue as to causal connection.'") (citation omitted).

### 3. Captains Dawson, Huemann, and Livingston

Plaintiff offers no admissible evidence that Captains Livingston, Huemann, and Dawson – the decisionmakers in the 2001 testing process – harbored a personal anti-union bias, let alone that

they retaliated against him on the basis of his union activities in calculating his Merit and Efficiency scores.

Moreover, Defendants have offered substantial evidence of non-discriminatory reasons why they chose to rank Plaintiff lower than many of his co-workers in a head-to-head comparison, and Plaintiff has not offered any evidence that the proffered reasons were pretextual and not based on the Captains' honestly held beliefs. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision. . . . Our only concern is whether the legitimate reason provided by the employer is in fact the true one."); *Johnson*, 70 F.3d at 482 (holding that mere "unsupported conjecture" is not sufficient to rebut a properly supported claim that an adverse employment decision was based upon legitimate factors).

First, Plaintiff asserts that he "did not do anything different and did not change in any way" between 1997, when he made the eligibility list, and 2001, when he did not pass the Merit and Efficiency portion of the examination. (Pl.'s LR 56.1(b)(3)(B) ¶ 282.) Plaintiff's implication is that he did nothing differently, so the evaluators must have applied different (prejudicial) criteria in 2001. However, Plaintiff "must do more than challenge the judgment of his superiors through his own self-interested assertions. The employee's perception of himself is not relevant. It is the perception of the decision maker which is relevant." *Karazanos*, 948 F.2d at 337 (internal quotations and alteration omitted) (citing *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989)); *see also Young v. Bd. of Fire & Police Comm'rs of Vill. of Mount Prospect*, 566 N.E.2d 331, 333 (Ill. App. Ct. 1990) ("[T]he subjective nature of the evaluations of [prospective candidates] by the raters does not give rise to a presumption of bias or prejudice. Indeed, Illinois courts have recognized the

legislature's intent to leave such matters as merit and efficiency ratings to the sound discretion of the Board.").

Second, Plaintiff argues that the Captains "admitted" to taking Plaintiff's union involvement into consideration during the Merit and Efficiency evaluation. (*Id.* ¶¶ 294-95.) Plaintiff asks this Court to infer a nefarious motive from that "admission," but the unrebutted testimonial evidence in the record shows that Plaintiff's union activities were considered as a positive during the evaluation process. (Defs.' LR 56.1(a)(3) ¶¶ 149-53.) Plaintiff's belief that the Captains scored his union activity negatively is speculative and does not raise a triable issue of material fact. *See Richter v. Vill. of Oak Brook*, No. 01 C 3842, 2003 WL 22169763, at *17 (N.D. Ill. Sept. 19, 2003).

Third, Plaintiff offers testimony that firefighters were better off if they kept a low profile, did not "make waves," and did not "creat[e] controversy." (Pl.'s LR 56.1(b)(3)(B) ¶ 135.) A booklet given to new firefighters stated, among other things, that it was best not to argue and that "if you have nothing good to say – say nothing at all." (*Id.* ¶¶ 148-49.) However, even if this evidence proved management discriminated against firefighters for being too visible or controversial, it would not reasonably lead to an inference of anti-union bias, let alone retaliation against Plaintiff for his stance on union issues.

Fourth, Plaintiff's allegation that the decision not to promote him in February 2001 was in retaliation for a letter he wrote to the editor of a local newspaper *eight months later* has no basis and will not be considered. *See Stewart*, 207 F.3d at 377-78 (noting that a discussion occurring after an employment decision was made could not have formed the basis of that decision, and stating that plaintiff's argument to the contrary was "frivolous").

Plaintiff's "evidence" of anti-union bias on behalf of management consists of sketchy reports of conversations he had with other firefighters in which they discussed the rumor mill and their speculative belief that union involvement would negatively affect one's ability to be promoted. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 133-42.) All of Plaintiff's evidence of anti-union bias in promotions, however, is idle talk among fellow firefighters that rarely rises beyond the level of hearsay. For example, in support of his retaliation claim, Plaintiff cites the testimony of firefighter Dale Steward, who remarked, with regard to rumors of anti-union discrimination: "It was commonly joked about in conversation. . . . just common teasing. . . . it's generally been just a ball bust, just teasing." (*Id.* ¶ 134.) Plaintiff's testimony that "'he felt and that everybody knew'" that discrimination was taking place is not sufficient to defeat summary judgment. *See Karazanos*, 948 F.2d at 337.

Moreover, most of those who testified about a perceived anti-union bias in promotions could not identify *any* particular member of management who held such a bias, and *no one* testified that the Captains who evaluated Plaintiff on Merit and Efficiency held such a bias. (*See* Pl.'s LR 56.1(b)(3)(A) ¶ 175.) The only specific evidence of anti-union animus are comments made by Lieutenant Clark (who did not calculate Plaintiff's Merit and Efficiency scores) in 2003 (two years after the alleged retaliation occurred). (*See* Pl.'s LR 56.1(b)(3)(B) ¶¶ 142-46.)

Notably, one of Plaintiff's complaints about the 2001 Merit and Efficiency process was that the Captains did *not* actually consider the Lieutenants' opinions in calculating his Merit and Efficiency score. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 77, 138). Plaintiff claims that Lieutenants are better able to evaluate firefighters than are Captains because Lieutenants observe firefighters in the field. (Pl.'s LR 56.1(b)(3)(B) ¶ 76.) Plaintiff essentially asks the Court to infer that he would have fared better if the Captains had considered the Lieutenants' scores in his Merit and Efficiency evaluation.

The evidence in the record, however, does not support the inference. Plaintiff does not dispute that the Lieutenants ranked him much lower than the Captains did in the category of leadership, and they gave him the lowest possible score on teamwork. (Defs.' LR 56.1(a)(3) ¶ 138.) It cannot reasonably be inferred that the Captains' choice to consider, or not consider, the Lieutenants' scores was done for the purpose of retaliating against Plaintiff for his union advocacy.

Plaintiff goes on to argue that the Lieutenants rated him low because they were directed to do so by some unidentified person or entity, but no evidence in the record supports that conclusion. Plaintiff responds that just because he has no direct knowledge that the Lieutenants were told to retaliate against him, that "does not establish that no one actually directed the lieutenants to grade Cunningham low due to his union involvement." (Pl.'s LR 56.1(b)(3)(A) ¶ 173.) Plaintiff's statement is pure speculation, it does not create a material issue of fact, and it will not be considered.

Plaintiff's reliance on *Quinn*, in which Judge Coar denied summary judgment on a First Amendment retaliation claim, is not persuasive for two reasons. First, unlike in the instant case, the plaintiffs in *Quinn* offered specific evidence allowing an inference that the persons who evaluated candidates for promotion considered the plaintiffs' union activities in a negative manner. Second, that opinion did not discuss the third step in the analysis of § 1983 claims based on violations of the First Amendment. Therefore, it is not known whether the *Quinn* defendants offered evidence of a non-pretextual motive not to promote the plaintiffs, as is evident in this case. *See Quinn v. Vill. of Elk Grove Bd. of Fire & Police Comm'rs*, No. 01 C 8504, 2002 WL 31875464, at *5-7 (N.D. Ill. Dec. 24, 2002).

Finally, some of Plaintiff's evidence of alleged bias relates to his protected speech that occurred *after* the last adverse employment action and could not have formed the basis of a decision to retaliate.

Plaintiff has failed to offer a single piece of admissible, non-speculative evidence that Defendants retaliated against him based upon his protected speech. Furthermore, Plaintiff has not offered evidence that Defendants' stated reasons for scoring him low on the Merit and Efficiency evaluation were a pretext. *See Mills v. Health Care Svc. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999) (holding that where a defendant offers multiple legitimate reasons for the adverse employment decision, a plaintiff cannot defeat summary judgment unless he shows that all of the stated reasons were pretextual). Therefore, summary judgment must be awarded in favor of all Defendants on the claim of First Amendment retaliation.

For the same reasons the Court find no liability under section 1983, the Court also finds that the individual defendants are entitled to qualified immunity, and there is no basis for municipal liability. In addition, Plaintiff's equal protection claims are "mere rewording" of his First Amendment retaliation claims and are therefore disposed of for the same reasons as the retaliation claims. *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (1988).

## CONCLUSION

For the foregoing reasons, the motions of Defendants The Village of Mount Prospect, Michael Figolah, Charles Livingston, Henry Dawson, and Anthony Huemann [doc. no. 63-1] and Village of Mount Prospect Board of Fire and Police Commissioners [doc. no. 66-1] for summary judgment on the complaint of Plaintiff Timothy Cunningham are granted. Defendants' motion for

judgment on the complaint of Plaintiff Timothy Cunningham are granted. Defendants' motion for sanctions under to Federal Rule of Civil Procedure 11 [doc. 82-1] is denied. This case is hereby terminated.

**SO ORDERED.**

ENTERED: 3/1/04

Ronald A. Guzmán
United States Judge